Good morning, Your Honours. My name is Karim Odeon. I'm the Vice-President of the Supreme Court. He will speak right into the microphone. Mr. Clifford Esomonu is a petitioner in this case. Esomonu is a father of six children. He entered the United States in 1998. He married a citizen of the Jewish secondary in the United States, and he filed an application for citizenship status. While the application was pending, there was a decision by the government that he may not approve the marriage, and he was put on proceedings. Within one year of the proceedings, he contested the decision after the fact that it was done for immigration purposes. The wife tried a lawyer. The wife appeared in court. It was binary. The wife did not testify. However, she did appear in court. The court gave an opportunity for suicide within a year of being in proceedings. It was the BIA decision on page 1. The case was put on proceedings March 2009. It was put on proceedings March 1999, and in February 2000, he filed the application for asylum. The application was pending. He, being a father of six children, approved for an informal visa, which is an application by the Foreign Service of the U.S. to give him the right to work in the United States. He applied for alternative culture without prejudice in his own application. By the record, what he says, that it's on page 0084, where he says, his lawyer says to the judge, Your Honor, we would like to, and this will be without prejudice in this application, we would like to see through his alternative culture to make sure that all children are there. He was explained clearly, though, that he was basically abandoning his application for asylum. The judge was pretty clear about that, right? Well, that's easy, Your Honor. The record is quite confusing. It was almost a 12-page discussion where he began by addressing the alternative culture without prejudice in his own application. The court didn't really address it at first. The court first said he deported him, and then there was a lot of colloquy, and there was a point where he replaced the time off the record when the court asked him whether or not he was trying to have kids without prejudice. That never happened, and so that's not a court ruling. However, when he did finish, there was several pages of discussion where he addressed mostly marriage, but he shouldn't have been of any interest according to the culture he used to be very engaged in. He wasn't really fully interested. So, whether he understood, whether or not he understood that, is a different issue, because the record seems a little bit confusing, whether or not what was on his case. He indicated in the transcript that he understood that he would be giving up his ability to bring this case again because he was agreeing to voluntary departure. I'm not sure I understand why that wasn't clear. Well, Your Honor, it's... He qualifies under false defense. There were so many questions that were asked. What happens a lot of times is when you have a lot of issues, including the case, what people understand every time the question is asked may be... In other words, it was almost 50 pages of discussion from the time he proposed the budget, but with prejudice, and the time the court actually goes across whether or not he's understood that. So, I'll leave it to the court to make a determination as to that, but I do think the record is good. It's just something to re-examine as to what he was actually doing. But even then, Your Honor, I think the case does seem to be fair. Even if he did withdraw with prejudice, including the other release, the case on the right side, I think it's more important that your position review the decision to reinstate the application on October 23rd, 2015, whether or not he did with prejudice or not, should, in effect, whether or not the court can address his right to reinstate the application, especially given the fact that he was perfectly true to his visa and the government refused to let him back in the country even though he had a valid visa, it would appear that the court... So, where the evidence demonstrates it's more likely than not that your client would be tortured if he is returned to Nigeria. Although, I want to make sure that I understand, you know, I'm trying to understand what's your best evidence on that that would compel us to conclude that he will more likely than not return to Nigeria. Yes, Your Honor, I'll address that evidence. He testified that he had a pharmacy in northern Nigeria. It was on a rise, and the pharmacy was brought into location, so they had to go into hiding. Because of that, it's actually pretty clear there was a lot of stores next to him that would have online locations. These stores were not established yet. He returned to Nigeria, and did he say good day?  but I can't think in terms of the location. This is, like, around 49th Avenue or something like that. But that was a long time ago when pharmacies were burned, many years ago, I guess. What's the color of the evidence, Your Honor, to show that the condition still continues? That's what I hear. That's what my question is, because it seems like the two instances involving the past persecution of all these burning of the pharmacies that occurred in 1990 and 1993, if I recall correctly, your client is alarmed by the incident and appears in resentment from a general religious riot, and your client was never detained or arrested or interrogated in Nigeria. Most of the evidence that you point to or refer to in your briefing post-date is application, and I'm just not sure what it is that you want us to focus on as your best evidence in this regard. Well, Your Honor, you testified that we did have a... We did join two organizations when we went back to Nigeria in 2003. These organizations are also called Masao, which is the Movement for National Religious Solidarity. We have a separate movement in Nigeria, and there were several instances where several members of the opposition were arrested and tortured, and in fact, you testified one of his brothers killed one of his cousins. I'm so curious about the two things. So you said one of your brothers is a cousin and seemed to be confused about their relationship. No, no, two different people, Your Honor. You didn't say... He doesn't say that. I mean, I know you're saying that, but I don't think he says that. He did submit several evidence of standing on his own accusation and several evidence of working with the opposition to help improve schools and the group was subjected to torture and violence. Persecution in Nigeria is one of the evidence of his future persecution. Your Honor, is there still time for a revisal?  one of the issues, please? This is relevant because the issue of asylum, I don't understand why this person isn't withholding. However, withholding has a much higher level of proof and that's the reason why we're looking at this kind of application. I didn't cite the case of Humar V. Ashcroft, which indicates that with asylum, it's not less than a 10% chance with withholding of 15%, and it's a huge difference because even that proof is likely to be tortured. If you apply for asylum, you're going to have to show and it's called a general argument of how being subjected to persecution is a very low standard and it's a huge difference. That's why it's very important for us to review because if your case is critical, then we look at the withholding question because of the situation in some country. It's critical. However, Your Honor, with his poetry, how do you show it's more likely than not to be tortured? As I explained, with asylum, it's up to you. I think I'll clarify. I will not return it. I will not return it. I understand it. Counsel, this case is already going back. Is that correct? Because there's one issue that still has to be addressed below and the board decided that, right? It's already back to the immigration judge, right? I'm sorry, but I... If I'm misaccepting, the board has remained in the case until voluntary departure. The case was already back before the immigration judge regarding voluntary departure. I did take a look and see if there were any subsequent board decisions and there were not. So it appears as though the determination as to whether voluntary departure was granted or not was not something that the petitioner then appealed again in the case. As we addressed in our brief, when a case is remanded only for determination as to voluntary departure, that doesn't impact the court's jurisdiction over the merits of the claim, whether the person is... I was just getting the update on where we were with this. You're correct, Your Honor. It did go back to the immigration judge for purposes of a voluntary departure determination. It's just there wasn't something from the... There wasn't a board decision. I couldn't access that from my databases. I did check to see that. The petitioner's counsel would likely have a better idea as to whether voluntary departure was ultimately granted again in this case. And if he doesn't, I can follow up on that. I can answer that when it comes to negotiation. That'd be useful. Can you reinstate your appearance? I'm sorry, Your Honor. May it please the Court, this is Stephanie Yannis for the respondent in this case. The record regarding the petitioner's withdrawal of his asylum application is not confusing in this case. The agency did not abuse its discretion when it declined to reinstate the 2000 asylum application because the petitioner knowingly and voluntarily withdrew that application in exchange for voluntary departure. That appears in page 109 of the administrative record. In that exchange, the petitioner agrees to withdraw his application and understands that he won't be able to proceed on that application again absent exceptional circumstances. Do we have a point to this question on the... Do we have a point to this question? Are you asking about the standard applied for a withholding or removal claim? The petitioner is correct that when addressing the future fear of persecution, it's a lower... The petitioner has to reach a lower threshold for the likelihood of harm when it's an asylum application versus a withholding of removal application. This actually gets at some of the maneuvers that were utilized in this case to try and fashion a way to show that the petitioner had filed for asylum in a timely fashion, but he did not do so in this case. I would like to point out that the petitioner's counsel referenced the petitioner returning to Nigeria in 2003, which was a statement that he included in his renewed asylum application in a new statement. But then he was sworn to that, and then he retracted it. Of course, we can't do it with the credibility issues here. Do you agree with that? I mean, there was no adverse credibility determination in this case, but the petitioner has stepped back from the claim that he returned to Nigeria. He did not return to Nigeria. He went to Canada, and then he illegally returned to the United States in 2003. When that was revealed, that appeared to be the impetus for wanting to return to the 2000 asylum application in this case. This is not like other situations involving a reinstated asylum application, because the petitioner in this case did, in fact, get his motion to reopen granted. He provided a new asylum application, albeit with some false information, and he was able to then get a hearing on the merits of his claim. Well, yeah, it was also not timely, correct? The second application... Well, no, we're questioning. Well, the second application, if the immigration judge were inclined to believe what was submitted with his application, it appeared to be timely, but then once he was in removal proceedings, he admitted that he returned to the United States in 2003, not 2006, which made his 2007 application untimely. I would also like to point out that an asylum application, in order to be timely, has to be submitted within one year of entry into the United States, not within one year of being placed in removal proceedings. That wasn't really an issue in this case, but I did want to clarify that. I would also... The respondent... Yeah, let's just break this down a little bit. We have a motion to re-enact. He's appealing the denial of a motion to reinstate. Is that correct? Yes. And then he's also appealing the denial of a motion to reopen. No, his motion to reopen was granted. That was how he got back into immigration court after he had withdrawn his asylum application. But then after the motion to reopen was granted, the court denied the country condition change. Is that right? Based on the country condition change. There was no change, and also... Is that right? Yes, that goes to whether, once we were faced with the fact that the petitioner did not return to the country in 2006, he returned to the country in 2003, the question of whether he's eligible for asylum at all goes to whether he can show an exception to the one-year filing deadline. And if so, he can't? He can't. Well, our initial argument is that there isn't jurisdiction for this court to review that in this case. Now, the respondent is cognizant of this court's precedent in saying that a mixed-question fact in law is something that the court can exercise jurisdiction over. But in this case, we don't have clear facts regarding the extraordinary circumstances that allegedly excuse the untimeliness of the asylum application. The petitioner claims that he was delayed in filing because he moved, he had two different attorneys in a few years, and that it took time to get a hearing in immigration court. These are not the kinds of established facts that can be applied to a legal standard to determine whether the agency reached the correct determination on the law. And is that the only way we reach the country conditions, and I want to make sure I understand. Oh, so there are two ways that someone can show that the... I'm sorry. So the country conditions, our argument is that the petitioner had waived that issue in his opening brief. The petitioner's brief did not lay out a clear explanation as to how the country conditions actually impacted his delay in filing the application. If the court were interested in addressing that, though, as the court pointed out in its decision, the documentation that he provided postdated the time that he, when he decided to file the asylum application in the first place. So later evidence can't show that, can't excuse his delay in filing. I'm not sure on this question on the standard that was used, and it looks like in page 3 of the board plan that they didn't correctly state the standard. But you can take a look at it if it says, we also affirm the immigration judge responded. The respondent has not established that he faces the probability of torture, but the consent of the acquiescence of the Nigerian government, that's not exactly the correct standard. Is that a problem in that regard? They don't have to have acquiescence. They can have, as long as the blind is looked, then they get the standard wrong there. If you're correct that under Ninth Circuit law, the concept of acquiescence also includes willful blindness. I would have to take a look at the immigration judge's decision to see if that, it may well be that the immigration judge provided the correct... There's certainly a case that simply suggests that this was an incorrect statement of the standard, and that that's a problem. Also, the other, well, two things. One, I do, I should be able to tell the immigration judge's decision. If the immigration judge, because this refers, it affirms the immigration judge's finding, so if the immigration judge also put in the language regarding willful blindness, I'm sorry. Well, then the other thing I would say is that if the court is concerned about that, it would be a harmless error, because there's no evidence at all in this case that the petitioner would be targeted for torture. He's been out of Nigeria since 1990. There's some general evidence that people who participate in the group that he's since joined, since he's been in the United States, can experience some harm, but it's not... There's just nothing in this case to support the notion that he would have any risk whatsoever of harm reaching the level... The immigration judge's opinion on part of this issue, because the immigration judge does say that the person on the network claimed that he had been tortured at the hands of an Indian government and seemed to rely on that concept that he had to be tortured in order to... That would be incorrect. Oh, no, there has to be torture for the purposes of a convention against torture claims. Yes, I apologize if I... You have to be at risk, right? You have to be at risk. Yes, you have to... You have to show it's more likely than not that you've been incriminated. It would not be that you've been tortured in the past. No, but that is a consideration. If the immigration judge could make that conclusion, that would be...say that that would be incorrect. If the immigration judge said you had to be tortured in the past, that would be incorrect, of course. It's not that you have to be tortured in the past, but I didn't think that the immigration judge was determining only that. I apologize if I've created any confusion there, and I can follow up with the court regarding any specific concerns you might have about that. Thank you. Good morning, Your Honor. We have a fairly low company standard, and this argument has become my 28-day letter, and it's now in review. It has dropped for seven years, and third, on the 5th of June, 1936, when the court said, to Susanna Pugh, we saw that in the most showly and less composed conclusion that it is a difficult situation that you would suffer persecution if you come to grace the international association group of public opinion before it were termed quaint. So, as to the status, there are very low motions for your opinion. The actual decision itself to grant or not grant motions for your opinion is subject to very low standards, and after the calculations were decided, I don't know whether the court can make the decision. However, I will note that in this case, the motion that was not granted, the court did not grant him the right to offer asylum, or to be allowed to proceed with the court. Of course, that's very important, because the court said to us that they did not believe that the one-year issue applies in this case. However, this is... Let me stretch this here. It's ATFR 103.334-I, and it says that, of course, there's a 7-to-1-year deadline that includes an update for asylum contributions. So, it's the one-year. You don't have to file for one year. If you make no issue, the contributions couldn't tell you to file it. So, the one-year issue doesn't apply to the second application as well. However, the one-year issue, in the first application, you should write your contribution there as well. The statute itself is clear also. It says that you're allowed to file if you're within a reasonable period for all the time that you are in asylum. Excuse me. With some application ruling one year, if you're legal in the country, and you have a legal status in the country, you're not required to file it while you're in legal status. So, you're only allowed to file within reasonable time after the time you have status. It's not one of the exceptions to the statute. I believe I expressed that as well in 2011. So, as far as the evidence of his torture in Nigeria, the court is correct. He doesn't have to prove he was tortured. However, he has to show evidence that he's likely more likely than not to have been tortured in Nigeria. I do believe there's still a lot of evidence and records and a lot of articles which the court is missing of those previous applications. And so, I will show the conditions in Nigeria and show the procedure in Nigeria. So, for those reasons, I do believe it is established. Thank you. Thank you. Sir, is it in view of the law? Yes, it's in view of the law. Thank you. Thank you for your presentations here today. The case of Esomono v. Sessions, folks, please submit it. The next case on our docket is Petrus v. Blayne. Somebody will have to help me with that versus Jeffrey v. Sessions.
judges: Schroeder, Murguia, McCalla